FILED
2014 Mar-14  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS CLAY MCCUNE,** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:12-CV-3884-RDP** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF DECISION**

Plaintiff Thomas McCune ("Plaintiff") protectively filed a claim for a period of disability and disability insurance benefits ("DIB") pursuant to Title II of Section 205(g) of the Social Security Act (the "Act"). *See* 42 U.S.C. § 405(g). Plaintiff now seeks review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying his claim. Based on the court's review of the record and the briefs submitted by the parties, this court finds that the Commissioner's decision is due to be affirmed.

**I.      Proceedings Below**

Plaintiff filed his application for benefits on December 2, 2009, alleging disability beginning on July 8, 2009. (Tr. 153). His claim was denied by the Social Security Administration on March 8, 2010. (Tr. 61). Plaintiff then timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 22, 2010. (Tr. 66). Plaintiff's request was granted, and he received a hearing before ALJ Patrick Digby via video teleconference on April 22, 2011. (Tr. 29-58, 80). On June 7, 2011, the ALJ issued a decision finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Act. (Tr. 14-24). After notification of the ALJ's decision, Plaintiff timely filed an appeal with the Appeals Council on June 30, 2011, which was

denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Accordingly, this case is properly before this court for appellate review. *See* 42 U.S.C. § 405(g).

## II.     Statement of Facts

Plaintiff was born on April 10, 1966, making him 45 years old at the time of the hearing. (Tr. 123, 153). Plaintiff graduated from high school, but stated that he attended special education classes, which indicates he has a learning disability. (Tr. 193). Plaintiff alleges that his disability under the Act began on July 8, 2009, due to breaking his back three times, depression, and attempted suicide. (Tr. 189). Plaintiff previously worked as a groundskeeper, lawn sprinkler installer, and construction worker. (Tr. 44-45, 168-72, 198). However, Plaintiff has not worked since being laid off in July 2009. (Tr. 16, 143, 305). Plaintiff stated that he was not taking any medications at the time he filed his disability reports (Tr. 192, 207); however, at the ALJ hearing, he introduced evidence indicating that he is currently taking "depression pills" known as Celexa. (Tr. 47-48). Plaintiff was last insured on December 21, 2013. (Tr. 153).

On May 8, 2009, Plaintiff sought medical treatment at Athens-Limestone Hospital. (Tr. 236). Plaintiff was admitted for attempted suicide after taking 26 sleeping pills and was discharged without medication one day later. *Id*. Dr. Christopher Edwards, Plaintiff's treating physician, noted that Plaintiff was "awake, alert, and oriented" and had good judgment before his discharge. *Id*. Dr. Edwards also noted in his progress reports that Plaintiff reported a "0-No Pain" rating while there and also noted that Plaintiff best learns by verbal instructions and had no factors affecting learning and/or teaching. (Tr. 252-56).

On March 2, 2010, after the onset of his alleged disability, Plaintiff underwent a disability physical with Dr. Prem Gulati at Sparkman Medical Clinic on March 2, 2010. (Tr. 300). Dr. Gulati described Plaintiff as a high school graduate who is divorced with two children,

does not work, and smokes a pack of cigarettes a day. (Tr. 300). Dr. Gulati noted that Plaintiff complained of lower back pain stemming from a car accident in 1985 in which he broke his back, and reported that he was bed ridden for six months while in a back brace, and stayed on medications thereafter. *Id*. Dr. Gulati also noted that Plaintiff received no further treatment but reported that the pain is constant, ranging from sharp to achy, and gets "worse with moving around." *Id*. In the medical records submitted by Sparkman Medical Clinic, Dr. Gulati found that Plaintiff "had no difficulty getting on and off the table;" walked normally without assistance; and "was able to squat and rise up and was able to do heel and toe walk without difficulty." (Tr. 301). Dr. Gulati commented that Plaintiff is "well-developed, well-nourished, neat, and clean," "answers questions appropriately," and "appears to be in no acute distress." (Tr. 300). After the examination, Dr. Gulati found that Plaintiff suffers from "chronic low back pain syndrome status post compression fracture at T12." (Tr. 302). However, Dr. Gulati noted Plaintiff can do lifting, sitting, and standing jobs with little difficulty. *Id*.

On March 3, 2010, Dr. William McDonald conducted a mental disability evaluation of Plaintiff. (Tr. 305). Dr. McDonald reported that Plaintiff stated his primary illness was chronic pain resulting from three serious car accidents twenty years ago. *Id*. Plaintiff indicated to Dr. McDonald that his pain was a level eight on a scale of one to ten. *Id*. Plaintiff further stated that he had a drinking problem in the past and also suffered from depression throughout the years. *Id*. Plaintiff reported that he has neither undergone surgery for his physical pain nor received formal psychiatric help for his depression. (Tr. 305). While Plaintiff denied any suicidal thoughts or intentions, he did state that he sometimes feels "down and out" and mostly spends his time alone. (Tr. 305). Further, Plaintiff indicated that he worries about his bills and is "down about his situation." (Tr. 307).

According to Dr. McDonald's report, Plaintiff stated that he has been a landscaper "off and on" for the last twenty-five years, primarily for Southern Management Company. (Tr. 306). Plaintiff went on to say that he always had good relationships with his supervisors and co-workers and never missed work. *Id*. Dr. McDonald indicated that Plaintiff lives on his own and "is capable of independent living." *Id*. Although Dr. McDonald found that Plaintiff "appeared mildly depressed," he also noted Plaintiff was alert and fully oriented. (Tr. 307). After his examination, Dr. McDonald further commented that Plaintiff struggled with serial threes but did complete simple addition and change-making problems; correctly spelled words forward and backward; and could immediately recall three objects shown to him. *Id*. However, Plaintiff could only recall two of the three objects after a five-minute window and did not know his multiplication tables. *Id*. Still, Dr. McDonald noted that Plaintiff was able to perform four digits forward and backward on the Digit Span Task, describe his activities from the day before, and recall "various remote events" even though he had trouble remembering the dates. *Id*.

While Plaintiff "seemed to have a limited fund of general information," he identified the President, governor, and capital of the United States but could not identify the capital of Alabama or the number of weeks per year. *Id*. Additionally, Plaintiff could identify similarities between objects paired with one another but was unable to interpret simple proverbs. *Id*. Dr. McDonald found no "loose associations, tangential or circumstantial thinking, or confusion" and found his speech to be "slow but within normal limits." He further noted that no evidence or report suggested that Plaintiff suffered from "hallucinations, delusions, ideas of reference, grandiosity, paranoid ideation, unusual phobias, obsessions, or compulsions." *Id*. Although Dr. McDonald described Plaintiff's judgment and insight as "somewhat limited" due to his intellect, he estimated Plaintiff's intelligence level to be in the borderline range. *Id*.

Dr. McDonald also administered the Wechsler Adult Intelligence Scale—Third Edition ("WAIS-III") to Plaintiff and indicated that the test should be considered a valid indicator of his intellectual functioning. *Id*. Plaintiff received a verbal I.Q. score of 69, a performance I.Q. of 70, and a full scale I.Q. score of 67. (Tr. 308). In conclusion, Dr. McDonald placed Plaintiff in the "borderline intellectual functioning" range. *Id*. He maintained that Plaintiff's "ability to understand, carry out, and remember simple instructions does not seem to be impaired," but he will have "difficulty with more complex tasks." *Id*. Further, Plaintiff's "ability to respond appropriately to supervisors, co-workers, and work pressures is also likely to be mildly impaired" even though he responded appropriately with the examiner. *Id*.

On January 17, 2011, Plaintiff received X-ray reports pertaining to his back pain for both his lumbar and thoracic spine. (Tr. 351-52). The X-ray reports show that "superior endplate irregularity is seen within the upper lumbar spine" and "mild wedging of the T12 vertebral body is also identified"—all of uncertain age. (Tr. 352). Additionally, the X-ray reports showed that "pisiform is a lower thoracic spine at T11-T12" and "could represent prior compression fracture injuries of uncertain age." (Tr. 353).

On February 15, 2011, Plaintiff presented himself to Athens-Limestone Hospital again with additional thoughts of suicide. (Tr. 340). This time, Plaintiff indicated that he planned to commit suicide by shooting himself, even though he did not have a gun or money to buy one. *Id*. Plaintiff reported that he feels "helpless and hopeless for his current stressors." (Tr. 342). Plaintiff was transferred to the Eliza Coffee Memorial Hospital psych unit, and Dr. Masood Khan, Plaintiff's treating physician, diagnosed him with adjustment disorder with depressed mood and anxiety. (Tr. 340). Plaintiff was then placed on Celexa, an anti-depression drug, while under surveillance and was discharged at his request two days later after appearing to have low

risk for self-harm. *Id*. The Athens-Limestone Mental Center did not make a follow-up appointment because Plaintiff was not diagnosed with severe mental illness. *Id*.

Finally, a vocational expert ("VE") testified at the hearing before the ALJ on April 22, 2011. (Tr. 51-57). After reviewing Plaintiff's vocational information, the VE testified that there were no transferrable skills from his prior skilled jobs as a groundskeeper, lawn sprinkler installer, and construction worker. (Tr. 52). After the VE was given a hypothetical by the ALJ asking her to consider an individual with the same age, education, prior work history, and residual functioning capacity ("RFC") as Plaintiff, she testified that there are jobs in the nation or region such as an inspector and hand packager, garment sorter, and power screwdriver operator that this hypothetical person could perform. (Tr. 52-53). While the VE testified that Plaintiff's WAIS-III assessment indicated low levels of comprehension, she stated that its significance depends upon the job because "some jobs don't require very much comprehension." (Tr. 56).

## III.   ALJ Decision

Determination of disability under the Act requires a five-step analysis. *See* 20 C.F.R. § 404.1, *et. seq.* First, the ALJ determines whether a claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If a claimant engages in gainful work activity, then the claimant cannot claim disability. Second, the ALJ determines whether a claimant has a medically determinable impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities. Absent such impairment, a claimant may not claim disability. Third, the Commissioner determines whether a claimant's impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  If such criteria are met, the claimant is declared disabled.

If a claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine a claimant's RFC, which refers to the claimant's ability to work despite his impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether a claimant has the RFC to perform past relevant work.  If a claimant is determined to be capable of performing past relevant work, then he is deemed not disabled.  If the ALJ finds a claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.

In the last part of the analysis, the ALJ must determine whether a claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(g), 404.1560(c).

In this case, the ALJ initially determined that Plaintiff met the necessary insured status requirements under the Act to claim disability and DIB. (Tr. 16). Next, the ALJ made the following determinations: (1) Plaintiff has not engaged in substantial gainful activity during his alleged disability period; (2) Plaintiff has three severe impairments—status post compression fracture at T12 disc, borderline intellectual functioning, and adjustment disorder with depressed mood and anxiety; (3) Plaintiff's impairments or a combination thereof do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff has the RFC to perform unskilled, light work;[1] (5) Plaintiff cannot perform any past relevant

---

[1] The ALJ stated, "[U]nskilled, light work [is] defined as lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting for up to 6 hours in an 8 hour workday with normal breaks, and standing for up to 6

work; and (6) there are jobs in the national economy that Plaintiff is able to perform. (Tr. 16-23). Based upon these findings, the ALJ found that Plaintiff was not disabled and denied Plaintiff's claim for disability benefits. (Tr. 24).

## IV.   Plaintiff's Argument for Reversal

Plaintiff alleges two specific errors in the ALJ's decision denying his disability. First, Plaintiff argues that the ALJ erred in finding that he had a high school education. (Pl's Br. 2-7). In support of this allegation, Plaintiff asserts that Dr. McDonald's evaluation, his WAIS-III scores, and the testimony given at the hearing show that he does not have a high school education. *Id*. As a result, Plaintiff argues that the VE's testimony was flawed because she took an inaccurate view of his education level into consideration when making her determinations. (Pl.'s Br. 8).

Second, Plaintiff alleges that Dr. McDonald and the ALJ should have classified him under "mild mental retardation" rather than "borderline intellectual functioning." (Pl.'s Br. 3, 8-11). As such, Plaintiff alleges that he meets section 12.05(C) of the Listing of Impairments and is presumptively disabled. (Pl's Br. 11); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1. Thus, Plaintiff alleges that the ALJ erred in finding that he does not have an impairment or combination of impairments that meet or medically equal Listing 12.05. (Pl.'s Br. 3, 8-11).

## V.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847

---

hours in an 8 hours [*sic*] workday with normal breaks. The claimant is able to remember, understand, and carry out simple instructions and maintain concentration for an 8 hour workday in 2 hour increments with all normal breaks. Additionally, the claimant would require occasional (up to 1/3 of the workday) contact with the general public and any changes in work environment should be infrequent and gradually introduced." (Tr. 18).

F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42, United States Code, Sections 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

**VI.    Discussion**

After careful review, the court concludes that the ALJ's findings are supported by substantial evidence and that the ALJ applied the correct legal standards.

### A.    The ALJ's Determination that Plaintiff Had a High School Education is Supported by Substantial Evidence.

Plaintiff argues that the ALJ mischaracterized his education level which led to the VE's flawed testimony. (Pl.'s Br. 5-8). "High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through

skilled work." 20 C.F.R. § 404.1564(b)(4). Plaintiff alleges that the ALJ erred in concluding he had a high school education because evidence in the record suggested he was in special education classes, could read and write "very little," and had I.Q. scores in the "mild retardation" range. (Tr. 7-8). However, Plaintiff's argument fails for two reasons: (1) his reliance on these facts is insufficient to establish that he is not functioning at a high school education level,[2] and (2) he does not present any impact evidence indicating how a lower educational assessment would have affected his ability to perform the VE's proposed jobs.

The numerical grade level completed in school may or may not be an accurate indicator of a claimant's actual educational abilities—it could be lower or higher. 20 C.F.R. § 404.1564(b). In evaluating a claimant's education level, the ALJ may also consider "other information about how much formal or informal education [a claimant] may have had through [his] previous work, community projects, hobbies, and any other activities which might help [him] work." 20 C.F.R. § 404.1564(b)(6); *see also* 20 C.F.R. § 404.1564(a). Furthermore, evidence of a claimant's status without evidence of its impact on the claimant's ability to perform the jobs the VE proposed is insufficient to conclude that the ALJ's decision is not supported by substantial evidence. *Lipson v. Barnhart*, 347 F. Supp. 2d 1182, 1187-88 (M.D. Ala. 2004) (finding that claimant's belief that the ALJ made a "technical misstatement" as to her education level does not constitute reversible error and without evidence of impact—how the assessment actually impacted her ability to perform the vocational jobs—the court could not conclude that the ALJ's finding was unsupported by the record); *see also Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005) (noting Plaintiff failed to show how a lower education level would have impacted the VE's suggested jobs).

---

[2] *See Lipson v. Barnhart*, 347 F. Supp. 2d 1182, 1187 (M.D. Ala. 2004).

Here, contrary to Plaintiff's assertions otherwise, substantial evidence exists to support the ALJ's finding that Plaintiff had "at least a high school education." Plaintiff testified at the hearing that he graduated from high school. (Tr. 39). While Plaintiff testified that he attended special education classes and had trouble reading and writing (Tr. 39, 43), these facts do not compel the conclusion that he did not have a high school education. *See Lipson*, 347 F. Supp. 2d at 1187 (affirming the ALJ's finding that a claimant with "borderline intellectual functioning" who read at a third-grade level had a tenth grade education because she completed the tenth grade and consistently held job positions which required intellectual functioning); *see also Perez*, 415 F.3d at 463-64 (finding substantial evidence of a high school education when claimant graduated from high school even though he was enrolled in special education classes in high school, had trouble spelling, and could not fill out a job application).

Despite Plaintiff's limited reading and writing abilities, the ALJ noted that Plaintiff filled out his own disability paperwork without assistance, reporting that he could read, understand, and write more than his name. (Tr. 20). The ALJ also noted that Plaintiff has consistently worked semi-skilled and skilled jobs since high school.[3] *Id*. Additionally, there is no evidence in the record that Plaintiff had to receive special accommodations as a result of his borderline intellectual functioning while working those jobs. (Tr. 20). Rather, he appears to be similar to the Plaintiff in *Lipson* who had a low reading level but had heightened intellectual functioning as to her vocational ability. Thus, Plaintiff's reliance on his special education classes and limited ability to read and write is simply not enough to overcome the deferential standard afforded to the ALJ. Instead, Plaintiff's own testimony, his extensive past work history in semi-skilled and

---

[3] According to 20 C.F.R. § 404.1564(b)(4), this is consistent with a high school education by definition.

skilled jobs, and his ability to fill out his own disability paperwork provide substantial evidence to support the ALJ's finding that Plaintiff had "at least a high school education."

As a result, the VE's testimony was not flawed based on the ALJ's posed hypothetical. The ALJ, while asking the VE to consider a person of the same age, *education*, and prior work history as Plaintiff, explicitly instructed the VE to consider that this individual could "read some and write some" but has difficulty in both. (Tr. 52)  Only after considering these limitations did the VE determine that Plaintiff could perform jobs such as an inspector and handpackager, garment sorter, and power screwdriver operator—all of which fit within the ALJ's specified limitations to light, unskilled work. (Tr. 53). When directly questioned by Plaintiff's counsel at the hearing, the VE did agree that Plaintiff's reading and comprehension score and vocabulary score likely placed him at an elementary level. (Tr. 57)  However, even despite these low scores, the VE testified that these factors may have little significance vocationally because some jobs require little of either.[4] (Tr. 56).

Finally, even if the ALJ erred in finding that Plaintiff had a high school education (and, to be clear, that is not the case here), Plaintiff did not present any evidence showing how a lower educational assessment would have impacted his ability to perform the vocational jobs suggested by the VE. *See Lipson*, 347 F. Supp. 2d at 1187-88. Plaintiff previously worked semi-skilled and skilled jobs and testified to working those types of jobs since high school. (Tr. 44, 52). The VE's proposed jobs fell within unskilled, light work with even further limitations placed on that category by the ALJ. (Tr. 52-53). With these considerations in mind, it is difficult to conclude that the proposed jobs by the VE would require more intellectual functioning than Plaintiff's past relevant work history, and it is equally as difficult to conclude that a lower educational

---

[4] For example, the VE testified that a skilled vocabulary may not be necessary to perform many jobs because "[workers are] doing one specific job, and they're taught that job." (Tr. 56).

assessment would prove him incapable of performing the VE's proposed jobs. The ALJ appropriately described Plaintiff and his functioning limitations to the VE in the form of a hypothetical, and Plaintiff has failed to show how any change in the ALJ's technical educational categorization would affect his ability to perform the jobs proposed by the VE.

Thus, in light of the evidence in the record, the ALJ's finding that Plaintiff had a high school education is supported by substantial evidence. And even if the ALJ made a "technical misstatement" as to Plaintiff's education, Plaintiff has failed to show how it affects his ability to perform the jobs proposed by the VE.

### B. The ALJ Did Not Err in Finding Plaintiff Did Not Meet the Listing of Impairments Requirement for Mental Retardation, Listing 12.05(C).

Plaintiff next alleges that the ALJ erred in classifying him under "borderline intellectual functioning." (Pl.'s Br. 9). Plaintiff argues that the use of his lowest I.Q. score of the three produced by the WAIS-III test places him within the "mild mental retardation" category, thereby making him presumptively disabled under Section 12.05(C) of the Listing of Impairments.[5] (Pl.'s Br. 10-11). However, Plaintiff has not fully addressed all of the requirements of Section 12.05(C). That is, although a valid I.Q. score may create a presumption of disability, the analysis does not begin and end there as Plaintiff suggests. Rather, the ALJ may still reject the claim that Plaintiff meets listing 12.05 despite a valid I.Q. score falling within 60 and 70 inclusive range when other evidence in the record indicates that the scores are inconsistent with Plaintiff's actual intellectual functioning. *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1207-08 (M.D. Ala. 2002).

---

[5] Plaintiff's assertion that the lowest of his three scores should be the one used in conjunction with Section 12.05 is correct. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(c).

Section 12.05 provides that "mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . ."[6] 20 C.F.R. pt. 404, subpt. P, app.1, § 12.05. Moreover, subsection 12.05(C) states that "a valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function" qualifies an applicant as disabled. *Id.* at § 12.05(C). Plaintiff must satisfy both the requirements in the introductory paragraph of Section 12.05 and the requirements in Section 12.05(C) in order to meet the listing. *See id.* at § 12.00(A); *see also Pettus v. Astrue*, 226 F. App'x 946, 948 (11th Cir. 2007) (unpublished opinion) (stating that a claimant must meet the requirements in Listing 12.05(C) in addition to the requirements in the introductory paragraph in Listing 12.05).

While it is true that Plaintiff's I.Q. scores do fall within the 60 through 70 inclusive range, the Eleventh Circuit has consistently recognized that "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery*, 979 F.2d at 837. In other words, the ALJ must consider the I.Q. score in conjunction with medical reports, daily activities, behavior, and other evidence in the record when making the determination. *See Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *Monroe v. Astrue*, 726 F. Supp. 2d 1349, 1355 (N.D. Fla. 2010); *Davis v. Astrue*, No. 2:07CV880, 2008 WL 2939523, at *3 (M.D. Ala. July 25, 2008) (affirming the ALJ's finding that the claimant did not meet the listing requirements of 12.05(C) despite her I.Q. score of 69 because she had worked in semi-skilled employment, had a twelfth grade education, received some training in cosmetology and secretarial skills, obtained a driver's

---

[6] In addition to meeting one of the four criteria listed in subsections (A) through (C), Plaintiff must also meet these introductory requirements. *Monroe v. Astrue*, 726 F. Supp. 2d 1349, 1355 (N.D. Fla. 2010).

license, had the ability to perform simple addition and subtraction, and had the ability to read and write).

Although the ALJ did not explicitly address Plaintiff's I.Q. score in his analysis of Section 12.05, there is nevertheless substantial evidence in the record to support the ALJ's finding that Plaintiff did not meet the listed impairment. The ALJ noted that Plaintiff graduated high school,[7] has worked consistently since graduation in skilled and semi-skilled jobs,[8] and read and completed his social security application without assistance. (Tr. 17).

In addition, the medical report of Dr. McDonald, who administered the WAIS-III test, further supports the ALJ's finding. Dr. McDonald estimated Plaintiff's intelligence in the borderline range after his mental examination. (Tr. 307). During the examination, Dr. McDonald found that Plaintiff could complete simple addition and change-making problems, immediately recall objects shown to him, and spell words both forward and backward. *Id*. Dr. McDonald indicated that Plaintiff was "capable of independent living," could perform four digits forward and backward on the Digit Span Task, describe his activities from the previous day, and recall past events.[9] *Id*. Plaintiff seemed to have a limited general knowledge but could identify the President, the governor of Alabama, and the capital of the United States. *Id*. Finally, he concluded that Plaintiff could understand, carry out, and remember simple tasks but would have difficulty with more complex tasks. (Tr. 309). He also concluded that Plaintiff would likely be mildly impaired in responding to supervisors and co-workers but could generally manage

---

[7] Plaintiff and his mother testified during the ALJ hearing that Plaintiff was in special education classes throughout his schooling, but the ALJ noted that as a part of school policy, the school reportedly no longer had anything on file for Plaintiff. (Tr. 38-39, 42-43).

[8] The VE testified at the ALJ hearing that Plaintiff's past relevant work for the last 15 years contained medium to heavy skilled or semi-skilled work. (Tr. 52).

[9] Dr. McDonald did note that Plaintiff had difficulty remembering the dates of past events. (Tr. 307).

financial gains he might receive from working. *Id*. Based on his examination of Plaintiff, Dr. McDonald placed Plaintiff in the "borderline intellectual functioning" range. (Tr. 308).

Finally, Plaintiff himself testified during the ALJ hearing that he lives alone, shops for his own groceries, drives approximately 50 to 60 miles per week, drives to visit his mother occasionally, does yard work, and can read and recognize others' driver's licenses. (Tr. 34-35, 49). Plaintiff also testified that he was aware of the safety concerns and dangers of his past job and participated in the necessary precautions while working. (Tr. 45). Further, Plaintiff admitted that he has always worked well with his co-workers and supervisors and never missed work. (Tr. 307). The ALJ noted that Plaintiff did not report that he received any special accommodations at any of his jobs, "indicating he was able to perform semi-skilled and skilled work without significant limitations from his lowered intellectual functioning." (Tr. 20). Although he is not currently working, Plaintiff testified that he will "walk down the road and maybe pick up little cans and stuff and sell them" in order to pay for his cigarettes. (Tr. 48).

Despite Plaintiff's I.Q. scores, the ALJ was permitted to look at these facts which are indicative of his adaptive functioning and conclude that Plaintiff did not meet the listing in Section 12.05 for mental retardation. *See Harris v. Comm'r of Soc. Sec.*, 505 F. App'x 874, 876 (11th Cir. 2013) (unpublished opinion) (affirming the ALJ's finding that claimant did not meet Listing 12.05 despite a valid I.Q. score because the psychologists who administered the WAIS-III concluded he fell at or above the intellectual borderline range; his previous work included jobs such as prep cook, dishwasher, and furniture deliverer; and there was no indication that his mental impairment caused any previous work problems). Thus, based on Plaintiff's graduation from high school, past relevant work history, Dr. McDonald's report, and Plaintiff's own

testimony, there is substantial evidence in the record to support the ALJ's finding that Plaintiff did not meet the requirements in Listing 12.05.

## VII.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed, and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this March 14, 2014.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE